1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| SUSAN M. CHADD, as Personal Representative of the ESTATE of ROBERT M. BOARDMAN, deceased, and for herself, | CASE NO. 11-5894 RJB |
| | ORDER GRANTING, IN PART, MOTION TO DISMISS |
| Plaintiff, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

11
12
13
14
15
16
17

This matter comes before the Court on the United States' Motion to Dismiss.  Dkt. 12.

The Court has considered the pleadings filed in support of and in opposition to the motion, oral

argument on 9 August 2012, and the file herein.

Plaintiff filed this Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, case against the

United States stemming from a fatal mountain goat attack which occurred in Olympic National

Park ("Olympic" or "the park").  Dkt. 1.  Now ripe is Defendant's Motion to Dismiss, where it

asserts that this Court lacks subject matter jurisdiction over Plaintiffs' claims because of the

18
19
20
21
22
23
24

1   discretionary function exception to FTCA liability, found at 28 U.S.C. § 2680(a).  Dkt. 12.  For

2   the reasons set forth below, the discretionary function exception applies and the Plaintiff's FTCA

3   claims should be dismissed.

4   **I.      BACKGROUND FACTS AND PROCEDURAL HISTORY**

5   **A.  BACKGROUND FACTS**

6        Olympic, formed in 1938, is one of the largest national parks.  Dkt. 13, at 2.  It

7   encompasses 922,650 acres and has over three million visitors per year.  *Id.*  Olympic has diverse

8   ecosystems, and is home to thousands of plant and animal species.  *Id.*

9        Several herds of mountain goats are included in the animal species found in the park.

10  Dkt. 13, at 2.  Mountain goats tend to be reclusive animals, and when alarmed or threatened will

11  generally seek out steep rocky areas.  Dkt. 14, at 2.  The summer goat range in Olympic is

12  approximately 147,000 square acres.  *Id*.  They favor habitat of steep mountain ridges and peaks.

13  *Id*.

14       The mountain goats are not native to the park, but were introduced a few decades prior to

15  the park's formation.  Dkt. 13, at 2.  They are considered by the National Park Service as "non-

16  native" or "exotic" species.  *Id.*  Accordingly, pursuant to national and Olympic Park policies,

17  they are not entitled to the same level of protection as native species.  Dkts. 25-1, at 26-27; and

18  12-2, at 8.

19       Olympic National Park is a "salt deficient range."  Dkt. 39-18, at 10.  As a result, various

20  mammals in the park, including mountain goats, seek out salt from human sources, including

21  antifreeze, urine (where the animal will lick up the vegetation and soil tainted with urine), and

22  human food.  Dkt. 39-18, at 10-11.  Additionally, mountain goats were known "at backcountry

23

24

1   campsites" to eat boots, pack straps, and sweatshirts for the salt content from sweating.  Dkt. 39-

2   18, at 11.

3       **B.  RECENT HUMAN – GOAT INTERACTION IN OLYMPIC**

4           Around 2004, Olympic's Wildlife Branch Chief and biologist Dr. Patti Happe, and other

5   park officials, became aware of increasing reports of habituated behavior of mountain goats in

6   the Hurricane Ridge area of the park.  Dkts. 14, at 3; and 39-18, at 9.  (Habituation here was the

7   loss of the mountain goat's fear response after repeated neutral or positive exposure to humans.

8   *See Id.* and Dkt.  31, at 17-18).  By 2006, the park began receiving reports of aggressive behavior

9   by the mountain goats, including "standing their ground, following or chasing humans, pawing

10  the ground, and rearing up."  Dkts. 14, at 3; and 26.

11          Olympic had a "Nuisance and Hazardous Animal Management Plan" in effect at the time.

12  Dkt. 12-2.  Under this plan, aggressive behavior was defined as "[b]ehavior where an animal

13  stalks, closely approaches, engages in threat displays, or chases a person."  Dkt. 12-2, at 5.

14  Mountain goats were listed as a "species of concern."  Dkt. 12-2, at 6.  It was noted that they

15  could become "quite tame," but are "unpredictable and possess dangerously sharp horns,"

16  although are "usually more pestiferous than dangerous."  *Id*.  The plan includes "Management

17  Alternatives" to deal with "problem animals."  *Id.*  These alternatives included:  1) education of

18  the public and training for staff, 2) warnings and advisories, 3) monitoring and observation, 4)

19  exclusion (used primarily for small mammals), 5) seasonal, non-emergency closures, 6)

20  emergency closures, 7) aversion training, 8) capture and release, 9) capture and translocation,

21  and 10) animal destruction.  *Id.* (*See* page 14, *supra*.)

22          Accordingly, after the park received further reports of increased habituation and possibly

23  aggressive behavior from mountain goats, park rangers and field personnel hiked into the areas

24

ORDER GRANTING, IN PART, MOTION TO
DISMISS- 3

1    with high reported goat-human interactions to observe and monitor the goats.  Dkt. 13, at 2.

2    They found that the goats were "demonstrating progressively habituated and sometimes

3    aggressive behavior."  Dkt. 13, at 3. The park service decided to use radio collars with Global

4    Positioning System units to collect data on the movement and habitat use patterns of the

5    mountain goats.  Dkt. 14, at 4.

6            In response to their observations and other reports from visitors, the park service began

7    providing visitors written and verbal warnings about the goats' aggressive behavior.  Dkts. 13, at

8    3; and 13-1, at 2-3.  Warning signs were also posted at trailheads.  Dkt. 13, at 3.  Efforts on

9    warning visitors were focused on the Klahanne Ridge (where the attack eventually occurred) and

10   nearby Hurricane Ridge.  Dkt. 13, at 3.  Park personnel also began using "adverse conditioning"

11   techniques on the goats.  Dkt. 13, at 4.  "Aversive conditioning is the use of various noise or

12   contact devices to frighten or haze animals and modify their behavior."  Dkt. 13, at 4.  The park

13   service felt that this type of conditioning could "help maintain an animal's fear of humans, deter

14   them from specific areas such as campsites or trials, or discourage undesirable behavior or

15   activity."  Dkt. 13, at 4.  The aversive conditioning that was used on the mountain goats

16   included: 1) throwing rocks, 2) yelling, 3) clicking hiking poles, 4) clapping, 5) snapping plastic

17   bags, 6) acting intrusively, 7) using sling shots, 8) shooting the goats with paint balls, and 9)

18   shooting the goats with bean-bags.  Dkt. 13, at 4.  This conditioning was used at Hurricane

19   Ridge, Klahanne Ridge, Seven Lakes Basin, Heart Lake and High Divide areas.  Dkt. 13, at 4.

20           Despite the park service's efforts, in 2009 and 2010, visitors continued to report a large

21   male goat chasing them and acting aggressively.  Dkts. 26-4, at 3-5, 7-10, and 15-17; 26-5, at 2-5

22   and 8-11; 51-3, at 40; and 60.  (In the years 2009-2010, there were around eight to eleven goats

23   in the Hurricane Ridge/Klahanne Ridge area.  Dkt. 51-1, at 22.)

24

ORDER GRANTING, IN PART, MOTION TO
DISMISS- 4

1    According to Sanny Lustig, the park ranger assigned to the Hurricane and Klahanne

2  Ridge areas, she and other park personnel had multiple conversations about how to manage the

3  goat.  Dkt. 51-1, at 34.  The conversations were "serious and really difficult."  *Id*.  She states that

4  the right management option "was not clear-cut" to any of them.  *Id*.

5    In June of 2009, the Wildlife Branch Chief Dr. Patti Happe, sent an email to Olympic's

6  Superintendent, Karen Gustin, the ranger assigned to the Hurricane and Klahanne Ridge areas,

7  Sanny Lustig, and others.  Dkt. 51-2, at 112.  Dr. Happe wrote to give an "update on the

8  aggressive billy goat situation at Hurricane Ridge, and start the conversation about additional

9  management options."  *Id*.  She noted that he has "been a problem for several years," that he is

10  "behaving in an increasing aggressive manner," and she thinks he "now perceives himself as

11  being the dominant critter."  *Id.*  Dr. Happe expressed concern that "it may only be an [sic]

12  matter of time until someone is hurt."  *Id*.

13    On July 6, 2009, Ranger Sanny Lustig, who was regularly patrolling the Switchback trial

14  to Klahanne Ridge and nearby areas, sent an email to Dr. Happe and various other park officials

15  about the "cranky goat."  Dkt. 26-4, at 11.  She notes that they had been hazing the relatively

16  large goat for some time, but it still returned to the trial and followed visitors.  *Id*.  She related

17  that one group of visitors reported that it followed them closely and made them nervous.  *Id*.  She

18  indicated that she was interested in further strategizing and noted "that's definitely the type of

19  encounter we want to immediately respond to."  *Id.*

20    The following year, on July 5, 2010, Ranger Lustig sent another email to Dr. Happe and

21  other park officials, stating that "[f]or the past two weeks or so reports of the big billy that

22  sounds pretty surely to be the one that has menaced the Switchback trial has been menacing the

23  Hurricane Hill trial."  Dkt. 51-2, at 109.  She states that "it seems his MO is to follow people to

24

the trial head, rear up and come in close proximity brandishing his hooves, and the latest was an

actual report of a head butt." *Id.*  It is her impression that he is "big, he's not wary, he pesters, he

looks mean and as if he'll get aggressive." Dkt. 51-2.  She notes that last year when they shot

him with bean bags he backed off.  *Id.*

On July 7, 2010, Susan Griffin, a researcher and Ph.D. candidate, who had worked in the

park, sent an email to Dr. Happe, regarding multiple encounters she had with "the goat" on

Hurricane Ridge.  Dkts. 39-15, at 2 and 39-18, at 6.  The email was entitled "Goat

Strategerizing" and Ms. Griffin related persistent contact by "the goat." Dkt. 39-15, at 2.  Ms.

Griffin commented that she was "skeptical that a bit of adverse conditioning will do much for

him.  He sees hundreds of harmless people every day. . . I was shocked by how determined he

was.  I caught him 4 times with rocks to no effect." *Id.*

At some time prior to July 30, 2010, but after Ms. Griffin's email, Olympic's

superintendent, Karen Gustin, Ranger Lustig, and Dr. Happe had a management team meeting to

share information and coordinate management activities regarding the increasingly aggressive

goat behavior.  Dkt. 39-18, at 7.  According to Dr. Happe, they "coordinated who was going to

do what as far as hazing and reporting," and the rangers were going to intensify the aversive

conditioning and report back to her about what they observed.  Dkt. 39-18, at 8.  Dr. Happe

states that she was tasked to explore moving the goat elsewhere.  Dkt. 39-18, at 6.

On July 30, 2010, Dr. Happe sent an email to Dr. Donny Martorello, the Washington

State Department of Fish and Wildlife's biologist in charge of mountain goats.  Dkt. 39-18, at 6.

Dr. Happe testified that she was exploring whether they "had an option for translocation" with

Dr. Martorello.  Dkt. 39-18, at 7.  In the email, Dr. Happe stated that Olympic has "a mature

billy" in the Hurricane Ridge area that is "not responding to [their] efforts to have him keep at a

ORDER GRANTING, IN PART, MOTION TO
DISMISS- 6

greater distance from people." Dkt. 25-5, at 3.  She noted that "[r]ecently he has been becoming increasingly aggressive and park management would like to explore other management options for him, including relocation from the area." Dkt. 25-5 at 3.  Dr. Happe admitted that, at the time she had written the email, the aversive conditioning had not worked for that one goat.  Dkt. 39-18, at 23.

In August and September of 2010, the park service continued to receive reports regarding the goats, including that goats were seen grazing on Klahanne Ridge (Dkt. 26-5, at 9), would not let hikers pass on the Klahanne Ridge trial (Dkt. 26-5, at 10-11), were seen pawing the ground (Dkt. 51-3, at 40), were following hikers (Dkt. 51-3, at 40), and acting "aggressively" (Dkt. 26-5, at 11).

## C.  ROBERT BOARDMAN IS ATTACKED AND KILLED BY A 370 POUND MOUNTAIN GOAT

On October 16, 2010, 63 year old Robert Boardman, his wife, Susan Chadd, and a friend, Pat Willits, were hiking on the Switchback trial to Klahanne Ridge, near Hurricane Ridge.  Dkt. 27.  When they stopped for lunch, they were approached by a large male mountain goat.  Dkt. 27, at 3.  It stood broadside with its neck bowed, pawed the ground, and bleated.  *Id.*  As the goat became more "agitated," they felt threatened by it and decided to leave.  *Id.*  They walked down the trail single file, with Mr. Boardman walking in the rear of the group.  *Id.*  The goat followed them and kept crowding Mr. Boardman.  *Id.*  He used the points of his walking stick to try to keep it away.  *Id.*, at 4.  The goat finally attacked Mr. Boardman by dropping its head and goring him in the leg with its horns.  *Id.*  It hit Mr. Boardman's femoral artery, and then stood over Mr. Boardman, not allowing anyone to approach.  *Id.*  Eventually, hikers were able to scare it off with a space blanket.  *Id.*  Mr. Boardman died as a result of the attack.  *Id.*

1    The park service destroyed the mountain goat within a few hours of the attack.  Dkt. 51-

2    1, at 34.  It was found nearby, had blood on its horn, and weighed 370 pounds.  *Id*.  It was

3    significantly larger than the average male mountain goat.  *Id.*

4    Before these events, there were three other mountain goat attacks in other national parks,

5    all non-fatal.  Dkt. 13, at 5.  Olympic staff members were not aware of the other attacks.  Dkts.

6    13, at 5; and 14, at 7.

7    **D.      PROCEDURAL HISTORY**

8    Plaintiff filed this FTCA case against the United States on November 1, 2011.  Dkt. 1.

9    Plaintiff contends that the National Park Service failed to act on numerous complaints regarding

10   this particular animal, failed to follow its own policies and procedures regarding hazardous

11   animals, failed to relocate or euthanize the goat, and failed to properly respond once the attack

12   had been reported.  Dkt. 1.  Plaintiff seeks damages.  *Id*.

13   **E.   PENDING MOTION**

14   The United States now moves to dismiss Plaintiff's FTCA claims, arguing that it is

15   immunized from suit under the discretionary function exception to the FTCA.  Dkts. 12, 33, and

16   45.  The United States here argues that there was no federal statute, regulation, or administrative

17   policy that mandated that park officials manage the goat population in a particular manner or

18   warn visitors in a specific manner, and so the challenged actions involved exercise of judgment.

19   Dkts. 12, 33, and 45.  It further argues that the decisions related to management of the goats were

20   susceptible to, and were based on, social, economic, and political policy considerations.  *Id.*  The

21   United States argues, accordingly, that Plaintiff's claims should be dismissed.  *Id*.

22   Plaintiff argues that there are several policies which mandated that the park service

23   remove or destroy the mountain goat before it killed Mr. Boardman, and that, therefore, the park

24

ORDER GRANTING, IN PART, MOTION TO
DISMISS- 8

1   service had no discretion in the matter.  Dkts. 24, 39, 41, 51 and 53.  Plaintiff points to evidence

2   that the park service knew that an aggressive, dangerous, and unusually large goat was menacing

3   hikers for years before Mr. Boardman's death.  *Id.*  Plaintiff argues that the park service knew

4   that aversion conditioning was not working, and therefore, policy dictated that it needed to

5   remove the goat – either by relocating it or destroying it.  *Id*.  Plaintiff also argues that the

6   discretionary function exception does not apply because, even if there was no policy in place

7   mandating action, the failure to implement an existing safety procedure was not a decision that

8   was based on social, economic or political considerations.  *Id*.

9                                    **II.   DISCUSSION**

10          **A.  STANDARD FOR MOTION TO DISMISS**

11          A complaint must be dismissed under Fed. R. Civ. P. 12(b)(1) if, considering the factual

12   allegations in the light most favorable to the plaintiff, the action: (1) does not arise under the

13   Constitution, laws, or treaties of the United States, or does not fall within one of the other

14   enumerated categories of Article III, Section 2, of the Constitution; (2) is not a case or

15   controversy within the meaning of the Constitution; or (3) is not one described by any

16   jurisdictional statute.  *Baker v. Carr*, 369 U.S. 186, 198 (1962); *D.G. Rung Indus., Inc. v.*

17   *Tinnerman*, 626 F.Supp. 1062, 1063 (W.D. Wash. 1986); *see* 28 U.S.C. §§ 1331 (federal

18   question jurisdiction) and § 1346 (United States as a defendant).  When considering a motion to

19   dismiss pursuant to Rule 12(b)(1), the court is not restricted to the face of the pleadings, but may

20   review any evidence to resolve factual disputes concerning the existence of jurisdiction.

21   *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988), *cert. denied*, 489 U.S. 1052

22   (1989); *Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1379 (9th Cir. 1983).

23          **B.  FTCA AND THE DISCRETIONARY FUNCTION EXCEPTION**

24

1        The United States, as sovereign, is immune from suit unless it consents to be sued. *See*

2   *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *Cato v. United States*, 70 F.3d 1103, 1107

3   (9th Cir. 1995). The FTCA is a limited waiver of sovereign immunity, rendering the United

4   States liable for certain torts of federal employees. *See* 28 U.S.C. § 1346(b). The FTCA

5   provides,

6       Subject to the provisions of chapter 171 of this title, the district courts, . . ., shall
    have exclusive jurisdiction of civil actions on claims against the United States, for

7       money damages, accruing on and after January 1, 1945, for injury or loss of
    property, or personal injury or death caused by the negligent or wrongful act or

8       omission of any employee of the Government while acting within the scope of his
    office or employment, under circumstances where the United States, if a private

9       person, would be liable to the claimant in accordance with the law of the place
    where the act or omission occurred.

10  28 U.S.C. § 1346(b)(1).

11       Among the exceptions to the FTCA waiver of sovereign immunity is the "discretionary

12  function exception." It excludes:

13      Any [§ 1346] claim based upon an act or omission of an employee of the

14      Government, exercising due care, in the execution of a statute or regulation,
    whether or not such statute or regulation be valid, or based upon the exercise or

15      performance or the failure to exercise or perform a discretionary function or duty
    on the part of a federal agency or an employee of the Government, whether or not

16      the discretion involved be abused.

17  28 U.S.C. § 2680(a). "The discretionary function exception insulates certain governmental

18  decision-making from judicial second guessing of legislative and administrative decisions

19  grounded in social, economic, and political policy through the medium of an action in tort."

20  *Myers v. U.S.*, 652 F.3d 1021, 1028 (9th Cir. 2011)(*internal citations omitted*). "The government

21  bears the burden of proving that the discretionary function exception applies." *Id.* Additionally,

22  "[t]he FTCA was created by Congress with the intent to compensate individuals harmed by

23  government negligence, and as a remedial statute, it should be construed liberally, and its

24

1    exceptions should be read narrowly." *Terbush v. United States*, 516 F.3d 1125, 1135 (9th Cir.

2    2008).

3          A two step test is used to determine whether the discretionary function applies. *Terbush*,

4    at 1129 (*citing Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)).  In the first step, the

5    court determines "whether challenged actions involve an element of judgment or choice." *Id*.

6    (*quoting Berkovitz*, at 536).  If the challenged actions do involve an element of judgment or

7    choice, then the court turns to the second step in the test.  *Id*.  The second step requires the court

8    to decide "'whether that judgment is of the kind that the discretionary function exception was

9    designed to shield,' namely, 'only governmental actions and decisions based on considerations of

10   public policy.'" *Terbush,* at 1130 (*quoting Berkovitz*, at 536-37).  The exception applies even if

11   the decision is an abuse of discretion.  *Id*.  Each of the steps will be examined below.

12              1.  <u>Whether Challenged Actions Involved an Element of Judgment?</u>

13          In the first step, the court determines "whether challenged actions involve an element of

14   judgment or choice." *Terbush,* at 1130 (*quoting Berkovitz*, at 536-37).  Under this step, the

15   "nature of the conduct, rather than the status of the actor" is examined. *Id.* "The discretionary

16   element is not met where 'a federal statute, regulation, or policy specifically prescribes a course

17   of action for an employee to follow.'" *Id.* (*quoting Berkovitz*, 486 U.S. at 536).  The inquiry ends

18   if there is such a statute or policy directing mandatory and specific action because there can be

19   no element of discretion when an employee "has no rightful option but to adhere to the

20   directive." *Id.*

21          On the outset, it is noteworthy that the Organic Act, 16 U.S.C. § 1, sets forth the broad

22   policy considerations that govern the NPS's management of national parks. *Terbush,* at 1130.

23   The NPS is "to conserve the scenery and the natural and historic objects and the wild life therein

24

1   and to provide for the enjoyment of the same in such manner and by such means as will leave

2   them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1.  "Much of the NPS's

3   work is grounded in the Organic Act's broad mandate to balance conservation and access."

4   *Terbush*, at 1130.

5          The Plaintiff here argues that certain park policies show that the park service's failure to

6   remove the problem mountain goat before October of 2010 was not a discretionary decision.

7   Dkt. 24.  She points to the national parks' "Management Policies 2006," sections 8.2.5.1 and

8   4.4.4.2, and argues that these policies mandated that the goat be eliminated well before it killed

9   Mr. Boardman, and so the park employees were not, in fact, acting with discretion.  *Id.*  The

10  "Management Policies 2006" do provide that "NPS employees must follow [the policies set

11  forth] unless specifically waived or modified in writing by the Secretary . . ."  (Dkt. 12-1, at 13)

12  and no waivers relevant to this case were made (Dkt. 25-3).  Plaintiff also references Olympic's

13  "Nuisance and Hazardous Animal Management Plan."  Dkt. 24.

14         The "Management Policies 2006," Section 8.2.5.1, "Visitor Safety," provides:

15         The saving of human life will take precedence over all other management actions
           as the Park Service strives to protect human life and provide for injury-free visits.

16         The Service will do this within the constraints of the 1916 Organic Act. The
           primary-and very substantial-constraint imposed by the Organic Act is that

17         discretionary management activities may be undertaken only to the extent that
           they will not impair park resources and values.

18

19         While recognizing that there are limitations on its capability to totally eliminate
           all hazards, the Service . . . will seek to provide a safe and healthful environment

20         for visitors and employees. The Service will work cooperatively with other
           federal, tribal, state, and local agencies; organizations; and individuals to carry out

21         this responsibility. The Service will strive to identify and prevent injuries from
           recognizable threats to the safety and health of persons and to the protection of

22         property by applying nationally accepted codes, standards, engineering principles,
           and the guidance contained  in Director's Orders #5OB, #5OC, #58, and #83 and

23         their associated reference manuals. When practicable and consistent with
           congressionally designated purposes and mandates, the Service will reduce or

24         remove known hazards and apply other appropriate measures, including closures,

guarding, signing, or other forms of education. In doing so, the Service's preferred actions will be those that have the least impact on park resources and values.

The Service recognizes that the park resources it protects are not only visitor attractions, but that they may also be potentially hazardous. In addition, the recreational activities of some visitors may be of especially high-risk, high-adventure types, which pose a significant personal risk to participants and which the Service cannot totally control. Park visitors must assume a substantial degree of risk and responsibility for their own safety when visiting areas that are managed and maintained as natural, cultural, or recreational environments.

These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing. Examples include decisions about whether to install warning signs or artificial lighting, distribute weather warnings or advisories, initiate search-and-rescue operations or render emergency aid, eliminate potentially dangerous animals, close roads and trails or install guardrails and fences, and grant or deny backcountry or climbing permits. Some forms of visitor safeguards typically found in other public venues-such as fences, railings, and paved walking surfaces-may not be appropriate or practicable in a national park setting.

Dkt. 25-1, at 29.

This portion of the park's Management Policies 2006 did not mandate that the park service remove or eliminate the mountain goat before October of 2012.  The broad language in this policy does not eliminate the park employees' discretion in how to handle a problematic mountain goat.  This policy language does not "specifically prescribes a course of action for an employee to follow." *Terbush,* at 1130.  Nor does this policy provide a timeline that must be followed.

Plaintiff also points to section 4.4.4.2, "Removal of Exotic Species Already Present" of the park's Management Policies 2006, which provides, "[a]ll exotic plant and animal species that are not maintained to meet an identified park purpose will be managed-up to and including eradication-if (1) control is prudent and feasible, and (2) the exotic species . . . creates a hazard to public safety."  Dkt. 25-1, at 28.

1    Section 4.4.4.2 of the park's Management Policies 2006 are likewise not helpful to

2  Plaintiff.  There is significant evidence in the record that the park service was attempting to

3  "manage" the mountain goat.  After the park received further reports of increased habituation

4  and possibly aggressive behavior from mountain goats, park rangers and field personnel hiked

5  the areas with higher goat-human interactions to observe and monitor the goats.  Dkt. 13, at 2.

6  They provided visitors written and verbal warnings about the goats' aggressive behavior.  Dkts.

7  13, at 3; and 13-1, at 2-3.  Warning signs were also posted trailheads.  Dkt. 13, at 3.  Park

8  personnel also began using "adverse conditioning" techniques on the goats.  Dkt. 13, at 4.

9  Further, a few months before the attack, Dr. Happe began exploring options to remove the goat.

10  Dkt. 39-18, at 6.  Section 4.4.4.2, "Removal of Exotic Species Already Present," does not

11  contain a specific course of action applicable to this case.

12    As a further source of a claimed mandatory course of action, Plaintiff points to

13  Olympic's Nuisance and Hazardous Animal Plan, which contains "Management Alternatives"

14  for problem animals.  Dkt. 12-2.  In 2010 it provided:

15    Many options are available to manage problem animals.  These are
      discussed below, arranged in a sequence of escalating management intervention
16    and actions.  For some species, such as black bear, a long history of management
      failures and successes exist. . . For other species, such as cougars, few proven
17    management techniques exist.
      **Education and Training:**  Education of the public and training of
18    employees is a priority activity.  As mentioned previously, prevention measures
      may eliminate the need for other more intrusive measures.
19    **Warnings and Advisories:**  An ongoing program to provide warnings and
      advisories for common or recurring wildlife problems should be a part of every
20    District's operating practices.  Routine warnings may be posted or distributed at
      all times. As appropriate for the location, and supplemented by specific advisories
21    and cautionary signs as needed.
      **Monitoring and Observation:** The best response to some types of
22    incidents is to simply monitor the situation. . .
      **Exclusion:**  This is the primary technique in dealing with many problem
23    species, particularly smaller mammals.  Sealing-off or screening possible entry
      points into structures . . . will avoid nuisance problems from skunks, bats, and

24

ORDER GRANTING, IN PART, MOTION TO
DISMISS- 14

1    rodents.  Except for a few elk exclosures maintained for research, it is not NPS
     policy to fence or control the movements of larger mammals. . .

2           **Seasonal, Non-Emergency Closures:**  Seasonal closures are pre-planned
     actions, as opposed to unplanned emergency closures.  Both planned and

3    unplanned closures are invoked under the Superintendent's discretionary authority
     contained in 36 C.F.R. 1.5. . .  Seasonal closures may entail various levels of

4    restrictions. . . Such seasonal closures are highly recommended as a means to
     allow near-normal use of adjacent areas while protecting public safety and park

5    wildlife.  Though more difficult to impose in front country developed zones, such
     closures may be used where warranted. . .

6           **Emergency Closures:**  This is a complete closure of a defined area to all
     entry and public use.  The purpose is protect the public while trying to avoid

7    imposing more intrusive measures on the problem animal.  Such closures are
     implemented only in response to a serious incident or repeated encounters

8    between people and hazardous animals in a fairly discrete, specific location.

9           **Aversion Training:**  The use of various noise, contact, or chemical
     devices to frighten or haze animals and modify their behavior (such as attempts to
     beg) may occasionally be employed.  These techniques must be precisely and

10   consistently applied to be effective, and their use must be part of an approved plan
     and involve experienced, qualified personnel.

11          **Capture and Release:**  Under this technique, a problem animal is
     captured using traps . . . and removed from the incident site and immediately

12   released nearby.  It is recommended for animals which are not likely to repeat the
     problem behavior or seriously threaten public safety. . .

13          **Capture and Translocation:**  This is the capture of an animal and
     moving it to another, more distant location or outside of the park.  It is rarely

14   effective, may be hazardous to the animal and personnel, and is not a suitable
     practice in most instances. . .

15          **Animal Destruction:**  Animals can be killed in several ways:
     -   Shooting with firearms by trained and authorized personnel,

16   -   Chemical euthanasia by qualified and designated personnel,
     -   Chemical immobilization followed by shooting.

17          The method used will be that which is most humane and efficient while
     protecting the safety of employees and bystanders.  In all cases, it will be one of

18   the above listed techniques.

19   Dkt. 12-2, at 9-10.  In non-emergency situations, the ultimate decision as to whether remove a

20   problem animal, whether by relocation or destruction, rested with the Superintendent.  Dkt. 39-

21   18, at 24.  The plan also includes a species specific "Mountain Goat Action Plan."  Dkt. 12-2, at

22   35.  It provides: "[m]ountain goats can be a nuisance around wilderness campsites where they

23

24

ORDER GRANTING, IN PART, MOTION TO
DISMISS- 15

will persistently seek salt and minerals from urine, packs, and clothing etc." *Id.* Under the

heading "Incident Management," the mountain goat plan states:

1. <u>Aggressive</u> hazing can mitigate this problem.  Simply tossing a few rocks and yelling will not dissuade these animals.  They must be struck with large rocks, chased, and pursued until they are some distance away from the area. . . This hazing is only a temporary measure, and the animals will inevitably return.
2. Another good hazing method is to use a wrist rocket (sling-shot) and rocks collected on site as ammo. . . .
3. More elaborate adverse conditioning may be authorized for this non-native species.  If animals are causing significant problems in an area (particularly if there is severe, localized resource damage to vegetation and soils) the [Natural Resources Management] Division should be contacted for other adverse conditioning methods which can be used.

Dkt. 12-2, at 35.

Olympic's Nuisance and Hazardous Animal Plan does not provide a mandatory directive

in regard to how to handle the situation facing the park officials here.  As stated above, they were

moving through the plan – they were educating the public, warning the public, using aversion

conditioning, and were considering removal of the goat.  Further, Ranger Lustig states that she

hiked the Switchback trail almost every working day, and encountered the goat less than about

half the time and "generally it wasn't doing anything at that time that required any actual

aversive conditioning."  Dkt. 51-1, at 19.  She states that she would, and did, aversive

conditioning on the goat if "it is was the right thing to do on any particular day."  Dkt. 51-1, at

19.  Moreover, the Nuisance and Hazardous Animal Plan's "Management Alternatives" uses

terms like "should" rather than "shall" and so leaves the park employees freedom to adapt to

different species and situations.  The Mountain Goat Plan, likewise, does not use any language

requiring mandatory action in the circumstances presented here.

To the extent that Plaintiff argues that the **timing** of the decision to remove the goat was

not discretionary under the above policies, she offers the testimony of Richard Olson, one of the

drafters of the Nuisance and Hazardous Animal Plan, who stated that resolution of problem

1   animals would normally be accomplished in one field season, and typically would take no longer

2   than two seasons. Dkt. 28, at 3.  He states that based on his experience (he was a ranger in

3   Olympic for 34 years and retired in October of 2006), "few non-lethal techniques worked on

4   intractable animals." Dkt. 28, at 3. Mr. Olson states that he personally encountered the goat and

5   threw a large rock at it.  *Id.*, at 3.  He states that it was unfazed by the pain.  *Id.*  He states that

6   "[b]ased on his experience and training, [he] consider[ed] it very unusual that despite reports of

7   this mountain goat's aggressive and threatening behavior toward people, the behavior was

8   allowed to persist for four years."  *Id.*  He states that after efforts to haze the goat failed, the park

9   service should have euthanized it.  *Id.*  He asserts that the decision to intervene with the animal

10  involved discretion, but once the decision to intervene started, "following the process to the end

11  does not involve discretion."  *Id.*, at 5.

12          Plaintiff also offers the Declaration of Paul Crawford, an Olympic park ranger for over

13  27 years, now retired, who stated that he was familiar with the goat that he believes to be the

14  same one that killed Mr. Boardman due to its large size, aggressive behavior, and general

15  location.  Dkt. 29, at 3.  Mr. Crawford states that he believes that the goat should have been

16  killed, or the animal should have been separated from visitors by closing the trail.  *Id.*, at 4.

17          Plaintiff additionally points to the opinion of Valerius Geist, PhD., a zoologist with

18  extensive experience with mountain goats, who states that, in his opinion, the staff at Olympic

19  "failed to take appropriate and timely measures to remove the habituated goat."  Dkt. 31, at 22.

20  He opines that the park service should have removed it particularly "after failed hazing attempts

21  lead to continued and repeated dominance displays during human encounters in 2009 and 2010."

22  *Id.*

23

24

1    While considering the events in October of 2010, it is unlikely anyone would disagree

2    with Plaintiff's experts – that further action should have been taken.  However, the timing of that

3    further action is not mandated by any of the identified policies.  Up until the attack, there was not

4    an emergency situation, and so the decision on whether and when to destroy the goat was left up

5    to the Superintendent.  Clearly, further actions here involved an element of judgment and choice

6    – the exercise of discretion.  Accordingly, there being no statute or policy directing either

7    mandatory and specific action, or specifying time for such action, the court must continue to the

8    second step of the discretionary function exception analysis.  *Myers,* at 1028.

9           2.   Whether the Judgment is of the Kind that the Discretionary Function
                 Exception was Designed to Shield – Decisions Based on Considerations of
10               Public Policy?

11   The second step requires the court to decide "'whether that judgment is of the kind that

12   the discretionary function exception was designed to shield,' namely, 'only governmental actions

13   and decisions based on considerations of public policy.'"  *Terbush,* at 1130 (*quoting Berkovitz,* at

14   536-37.)  In this context, public policy has been understood to include decisions "grounded in

15   social, economic, or political policy."  *Terbush,* at 1130 (*quoting Varig,* at 814).

16   In general, much of the park service's work is based on the mandate of the Organic Act,

17   16 U.S.C. § 1, which is to balance conservation of the parks and public access to them.  *Terbush,*

18   at 1130.  The park has provided evidence that the decisions of what to do about the habituated

19   mountain goats and the aggressive goat(s) prior to October of 2010, were, in part, grounded in

20   social, economic and political policy.

21   The park argues that management of the goat population is susceptible to policy analysis

22   because in deciding what to do and when to do it, they had to balance conservation of the goats

23   and overall park with public access to the trails.  Dkt. 12.  While acknowledging that the goats

24

ORDER GRANTING, IN PART, MOTION TO
DISMISS- 18

are a non-native species and are entitled to less protection than native species, park service employees referenced political pressure to conserve the goat population in this park.  Dkts. 13 and 14.  The park service discussed a move in the 1980s to remove the goats from Olympic. Dkt. 4, at 3.  They ultimately decided not to eliminate them entirely, and Deputy Superintendent Todd Suess acknowledged that in the "past, the park has encountered significant opposition to possible plans to remove some of the goats."  Dkt. 13, at 5.

Moreover, Ranger Lustig testified that what the park should or should not do about the goats elicited a range of responses from the visitors, thus implicating social concerns.  Dkt. 51-1, at 14.  She stated that during "educational encounters" she would have with visitors while hiking the trail,

> The most frequent response from people on that trial was generally that the goats, that the park should not hurt the goats.  So to explain that it was both for the animals' and peoples' safety that we were deliberately hurting them by way of hazing them on occasion, took a fair amount of explaining, that to maintain their natural wariness, which was healthier for them and better for people, we actually did inflict a pain stimulus.  So most people would respond with sympathy to the goats that we'd be hurting them.
> There was, at the other end . . . people who felt very strongly that the goats, since they are not native to the Olympics, should not be there at all, and the park management should be hunting them to eliminate them.

Dkt. 51-1, at 14.

Economic considerations also played into their decision making process.  The park service chose to spend resources on attempting to balance public safety with conservation of the goats, public access to the goats, and public access to the trails by increasing patrols, warning and educating the public, and engaging in aversion conditioning.  Deputy Superintendent Todd Suess states that all these actions diverted resources away from other park priorities.  Dkt. 13.

Plaintiff argues that "in light of the very aggressive behavior this well-known 370 lb goat was displaying for years" and the fact that the park's Mountain Goat Plan noted that aversion

1   conditioning would be unsuccessful, and it was unsuccessful, the park service's failure to take

2   the only rational and proper safety precaution was not the exercise of social, economic, or

3   political policy considerations.  Dkt. 24.

4           Plaintiff also cites *Francis v. United States*, 2:08CV244 DAK, (D.C. Utah Cent. Dist.

5   2011), an unpublished decision, in support of her position.  Dkt. 24, at 21-22.  The *Francis*

6   ruled that the discretionary exception decision did not apply where the park service failed to take

7   the only rational and necessary step - to destroy a black bear, that had attacked a camper the day

8   before it killed the Plaintiffs' eleven-year-old  boy.  *Id.* The court there held that no rational

9   consideration of public policy was involved.  *Id.*

10          This case is different in many respects.  First, a bear is a known predator.  The park

11  service personnel here, while acknowledging that someone might get hurt, did not know of any

12  mountain goat attacks, and later found out that there had been only three non-fatal goat attacks in

13  all the national parks' history.  The park service in *Francis* acknowledged that regulations in

14  place at the time required them to investigate the incident and to remain on site (even though

15  they did not).  No such regulations were in place here.  Unlike the situation in *Francis*, the park

16  service killed the subject goat immediately after the first attack.  Further, as discussed below, the

17  park service was balancing competing policy concerns as it tried to manage the mountain goats.

18          Plaintiff argues that while the design of the park's Nuisance and Hazardous Animal Plan

19  and other policies is protected by the discretionary function exception, the implementation of that

20  plan and other policies on the goat in question was not protected.  Dkt. 24.  Plaintiff cites

21  *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005), in support of her position.  *Id.*

22          In *Whisnant*, the plaintiff worked in the commissary at the U.S. Naval base in Bremerton,

23  Washington.  400 F.3d at 1179.  He brought suit against the United States for negligence under

24

1   the FTCA for injuries he sustained as a result of the government's failure to clean up toxic mold

2   which had accumulated at the commissary.  *Id.*  In rejecting the government's argument that the

3   decision not to clean up the mold was grounded in social, economic or political considerations,

4   the Ninth Circuit found, that "matters of scientific and professional judgment-particularly

5   judgments concerning safety-are rarely considered to be susceptible to social, economic, or

6   political policy," and that the failure to clean up mold there was a scientific and professional

7   judgment.  *Whisnant*, at 1181.  It held that the "decision to adopt safety precautions may be

8   based in policy considerations, but the implementation of those precautions is not.... [S]afety

9   measures, once undertaken, cannot be shortchanged in the name of policy."  *Id.,* at 1182 (*internal*

10  *quotation omitted*).

11       In acknowledging that the difficulty in distinguishing between what governmental

12  decisions regarding safety are based in social, economic, and political policy and those that are

13  not, the *Whisnant* Court reviewed other FTCA cases where safety had been an issue.  *Id.*  "[I]n a

14  suit alleging government negligence in the design and maintenance of a national park road, we

15  held that designing the road without guardrails was a choice grounded in policy considerations

16  and was therefore shielded under the discretionary function exception, but maintaining the road

17  was a safety responsibility not susceptible to policy analysis."  *Id.*, at 1181-1182 (*citing ARA*

18  *Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir.1987)).  It reviewed three cases where

19  injuries resulted from the government's failure to post warnings concerning hazards present in

20  national parks.  *Id*., at 1182 (*citing Valdez v. United States*, 56 F.3d 1177, 1178, 1180 (9th

21  Cir.1995); *Childers v. United States*, 40 F.3d 973, 976 (9th Cir.1994); and *Summers v. United*

22  *States*, 905 F.2d 1212, 1215 (9th Cir.1990)).  It remarked that the Ninth Circuit "held that the

23  government's decision not to post signs warning of obvious dangers such as venturing off

24

1    marked trails to walk next to the face of a waterfall, and the government's decision to use

2    brochures rather than posted signs to warn hikers of the dangers of unmaintained trails, involved

3    the exercise of policy judgment of the type Congress meant to shield from liability." *Id*. (*citing*

4    *Valdez* and *Childers*).  It noted that in *Summers,* though, "that such policy judgment was absent

5    when the government simply failed to warn of the danger to barefoot visitors of hot coals on a

6    park beach." *Id*. (*citing Summers*).  The *Whisnant* Court noted additionally that there was an

7    exception to the design/implementation distinction which was not relevant to the toxic mold

8    situation at issue there. *Id.*, n 3.  It found that "implementation of a government policy is

9    shielded where the implementation itself implicates policy concerns." *Id.*  For example, "where

10   government officials must consider competing fire-fighter safety and public safety considerations

11   in deciding how to fight a forest fire," *Id.* (*citing Miller v. United States*, 163 F.3d 591, 595-96

12   (9th Cir.1998)), or "balance prison safety and inmate privacy considerations in deciding how to

13   search a prisoner's cell in response to a reported threat of violence," *Id.* (*citing Alfrey v. United*

14   *States*, 276 F.3d 557 (9th Cir 2002)), "or weigh various regulatory objectives in deciding

15   whether to certify a new aircraft design" *Id.* (*citing GATX/Airlog Co. v. United States*, 286 F.3d

16   1168, 1175-77 (9th Cir.2002)).

17        As in *Miller*, *Alfrey* and *GATX/Airlog Co.*, implementation of park policy regarding the

18   management of the mountain goats implicated policy concerns.  The park was forced to balance

19   competing policy concerns of public safety (where there had been only three goat attacks in

20   national park history – all of which were non-fatal) with the public's desire to see the goats,

21   public access to the trials, and preservation of the goats.  Although in retrospect one can

22   conclude that the mountain goat should have been removed earlier, "that is the sort of judicial

23

24

1  second guessing of government decision-making that the discretionary function exception was

2  designed to protect." *Bailey v. United States,* 623 F.3d 855, 863 (9th Cir. 2010).

3              3.  Conclusion on Discretionary Function Exception Analysis

4      United States' motion to dismiss (Dkt. 12) should be granted, except as to the claim that the

5  Defendant failed to properly respond after the attack was reported.  (The remaining claim was

6  not argued or addressed by the pending motion.) Defendant is immunized from Plaintiff's FTCA

7  claims based on the discretionary function exception.  Plaintiff's FTCA claims should be

8  dismissed, with the exception mentioned.

9      While this Court recognizes Plaintiff's loss of her husband and her concern about the park

10  service's handling of the goat, Congress has given the park service a safe harbor in the

11  discretionary function exception to her FTCA claim, even if "the discretion involved be abused."

12  28 U.S.C. § 2680(a).  Mr. Boardman appears to have died trying to protect his wife and their

13  friend.  Even in sad cases like this one, the Court is duty bound to uphold the law, however

14  difficult or unjust the result appears.

15                          **III.    ORDER**

16      Therefore, it is hereby **ORDERED** that:

17          •  The United States' Motion to Dismiss (Dkt. 12) is **GRANTED;** and

18          •  Plaintiff's FTCA claim regarding the park service's management of the goat is

19              **DISMISSED**.

20  //

21   /

22

23

24

1       The Clerk is directed to send uncertified copies of this Order to all counsel of record and

2   to any party appearing *pro se* at said party's last known address.

3       Dated this 20th day of August, 2012.

4

5

6       ROBERT J. BRYAN
        United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER GRANTING, IN PART, MOTION TO
DISMISS- 24